PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

1285 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6064
TELEPHONE (212) 373-3000
FACSIMILE (212) 757-3990

LLOYD K. GARRISON (1946-1991)
RANDOLPH E. PAUL (1946-1956)
SIMON H. RIFKIND (1950-1995)
LOUIS S. WEISS (1927-1950)
JOHN F. WHARTON (1927-1977)

1615 L STREET, NW
WASHINGTON, DC 20036-5694
TELEPHONE (202) 223-7300
FACSIMILE (202) 223-7420

FUKOKU SEIMEI BUILDING
2-2 UCHISAIWAICHO 2-CHOME
CHIYODA-KU, TOKYO 100-0011, JAPAN
TELEPHONE (81-3) 3597-8101
FACSIMILE (81-3) 3597-8120

UNIT 3601, FORTUNE PLAZA OFFICE TOWER A
NO. 7 DONG SANHUAN ZHONGLU
CHAO YANG DISTRICT
BEIJING 100020
PEOPLE'S REPUBLIC OF CHINA
TELEPHONE (86-10) 5828-6300
FACSIMILE (86-10) 6530-9070/9080

12TH FLOOR, HONG KONG CLUB BUILDING
3A CHATER ROAD, CENTRAL
HONG KONG
TELEPHONE (852) 2536-9933
FACSIMILE (852) 2536-9622

ALDER CASTLE
10 NOBLE STREET
LONDON EC2V 7JU, U.K.
TELEPHONE (44 20) 7367 1600
FACSIMILE (44 20) 7367 1650

WRITER'S DIRECT DIAL NUMBER
212-373-2769

WRITER'S DIRECT FACSIMILE
212-492-0010

WRITER'S DIRECT E-MAIL ADDRESS
mpomerantz@paulweiss.com

MATTHEW W. ABBOTT
MARK H. ALCOTT
ALLAN J. ARFFA
ROBERT A. ATKINS
JOHN F. BAUGHMAN
LYNN B. BAYARD
DANIEL J. BELLER
MITCHELL L. BERG
MARK S. BERGMAN
BRUCE BIRENBOIM
H. CHRISTOPHER BOEHNING
ANGELO BONVINO
RICHARD S. BORISOFF
HENK BRANDS
JOHN F. BREGLIO
JAMES L. BROCHIN
RICHARD J. BRONSTEIN
PATRICK S. CAMPBELL*
JEANETTE K. CHAN
YVONNE Y. F. CHAN
DOUGLAS A. CIFU
LEWIS R. CLAYTON
JAY COHEN
KELLEY A. CORNISH
CHARLES E. DAVIDOW
DOUGLAS R. DAVIS
THOMAS V. DE LA BASTIDE III
ARIEL J. DECKELBAUM
JAMES M. DUBIN
LESLIE GORDON FAGEN
MARC FALCONE
PETER L. FELCHER
PETER E. FISCH
ROBERT C. FLEDER
MARTIN FLUMENBAUM
ANDREW J. FOLEY
HARRIS B. FREIDUS
KENNETH A. GALLO*
MICHAEL E. GERTZMAN
PAUL D. GINSBERG
ERIC S. GOLDSTEIN
ERIC GOODISON
CHARLES H. GOOGE, JR.
ANDREW G. GORDON
BRUCE A. GUTENPLAN
GAINES GWATHMEY, III
ALAN S. HALPERIN
CLAUDIA HAMMERMAN
GERARD E. HARPER
BRIAN S. HERMANN
ROBERT M. HIRSH
MICHELE HIRSHMAN
JOYCE S. HUANG
JEH CHARLES JOHNSON
MEREDITH J. KANE
ROBERTA A. KAPLAN
BRAD S. KARP

JOHN C. KENNEDY
ALAN W. KORNBERG
DANIEL J. KRAMER
DAVID K. LAKHDHIR
JOHN E. LANGE
DANIEL J. LEFFELL
JEFFREY D. MARELL
JULIA TARVER MASON
MARCO V. MASOTTI
EDWIN S. MAYNARD
DAVID W. MAYO
TOBY S. MYERSON
JOHN E. NATHAN
CATHERINE NYARADY
ALEX YOUNG H. OH
JOHN J. O'NEIL
KELLEY D. PARKER
ROBERT P. PARKER*
MARC E. PERLMUTTER
MARK F. POMERANTZ
VALERIE E. RADWANER
CAREY R. RAMOS
CARL L. REISNER
WALTER RIEMAN
RICHARD A. ROSEN
ANDREW N. ROSENBERG
STEVEN B. ROSENFELD
PETER J. ROTHENBERG
RAPHAEL M. RUSSO
JEFFREY D. SAFERSTEIN
JEFFREY B. SAMUELS
DALE M. SARRO
TERRY E. SCHIMEK
KENNETH M. SCHNEIDER
ROBERT B. SCHUMER
JAMES H. SCHWAB
STEPHEN J. SHIMSHAK
DAVID R. SICULAR
MOSES SILVERMAN
STEVEN SIMKIN
JOSEPH J. SIMONS
MARILYN SOBEL
TARUN M. STEWART
ERIC ALAN STONE
AIDAN SYNNOTT
ROBYN F. TARNOFSKY
JUDITH R. THOYER
DANIEL J. TOAL
MARK A. UNDERBERG
LIZA M. VELAZQUEZ
MARIA T. VULLO
LAWRENCE G. WEE
THEODORE V. WELLS, JR.
JORDAN E. YARETT
KAYE N. YOSHINO
ALFRED D. YOUNGWOOD
TONG YU
T. ROBERT ZOCHOWSKI, JR

*NOT ADMITTED TO NEW YORK BAR

July 16, 2007

__By E-mail and Federal Express__

The Honorable James P. Jones
United States District Court
Western District of Virginia
180 West Main Street
Abingdon, VA 24210

  *United States* v. *Purdue Frederick Company, Inc., et al.*, Case No. 1:07CR00029

Dear Chief Judge Jones:

    Defendant Michael Friedman respectfully submits this memorandum in further support of the parties' proposed plea agreements and in aid of his sentencing, which is currently scheduled for July 20, 2007.

    As set forth in more detail below, Michael Friedman and his co-defendants Howard Udell and Paul Goldenheim will appear for sentencing having each pled guilty to a single misdemeanor count of misbranding under Title 21, United States Code, Sections 331(a) and 333(a)(1). In each case, their pleas — if accepted by the Court — will be premised on the seldom-invoked strict liability provisions of the Food, Drug and

Cosmetics Act ("FDCA"), which allow for misdemeanor convictions *without knowledge* of or *intent* to commit the acts prohibited by the statute.

For the reasons that follow, we respectfully submit that the unusual nature of this case as it relates to the individuals warrants the Court's acceptance of the plea agreements proposed by the parties, and a sentence that includes neither incarceration nor probation. With respect to Michael Friedman, this conclusion is supported by a lifetime of documented good works — including efforts to combat the very abuse and diversion of prescription medications that forms the backdrop to this case — and a history of both extraordinary service to his community and exceptional devotion to his family. For all of these reasons, and without minimizing the harm that OxyContin abuse has caused to so many people in so many communities, we respectfully submit that whatever limited culpability attaches to a strict-liability crime is vastly outweighed by characteristics of the defendant and of the offense, and that a non-incarcerative, non-probationary sentence is more than sufficient to meet the ends of justice in this case.[1]

### The Offense Conduct and the Plea Agreement

The conduct that forms the basis for Michael Friedman's plea in this case is set forth in its entirety in the parties' Agreed Statement of Facts. The Agreed

---

[1] This submission is made on behalf of Michael Friedman and, accordingly, focuses on aspects of his particular character and background. We nonetheless respectfully submit that non-incarcerative sentences with no term of probation are appropriate for all of the individual defendants, and we respectfully join in the submissions of Paul Goldenheim, Howard Udell, and Purdue Pharma to the extent that they contain facts and arguments common to Michael Friedman.

Statement of Facts provides, in relevant part, that between December 12, 1995, and June 30, 2001, certain Purdue supervisors and employees, with the intent to defraud and mislead, marketed OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications. Agreed Statement of Facts ¶¶ 19-43. Importantly, neither the Misdemeanor Information filed in this case nor the Agreed of Statement of Facts — the exclusive factual basis for the pleas entered in this case — alleges that Michael Friedman himself engaged in any conduct with intent to defraud or mislead. Indeed, the Agreed Statement of Facts contains no statement that any of the individual defendants acted with any culpable state of mind whatsoever. Rather, the exclusive factual basis for the plea was Michael Friedman's position as a "responsible corporate officer" of Purdue at a time when certain Purdue sales representatives made misrepresentations to certain doctors about aspects of OxyContin's abuse potential. The Agreed Statement of Facts specifically recognizes that liability under the relevant statute does not require knowledge of — much less intent to engage in — any of the conduct prohibited by the statute.[2]

---

[2] As the Court is aware, the "responsible corporate officer" doctrine pursuant to which Michael Friedman has entered his plea allows a corporate officer to be convicted of a misdemeanor violation of the FDCA solely because that individual was in a position of responsibility and authority to ensure compliance with the Act. The Supreme Court of the United States has held that the law does not require a showing that the individual intended or even knew of the violation to be held responsible under the Act. *See United States v. Park*, 421 U.S. 658 (1975); *United States v. Dotterweich*, 320 U.S. 277 (1943).

On May 10, 2007, Michael Friedman appeared before the Court and entered a plea of guilty to a single misdemeanor violation of the strict liability provisions of 21 U.S.C. §§ 331(a) and 333(a)(1). The plea was entered pursuant to both Fed. R. Crim. P. 11(c)(1)(C) and a plea agreement with the United States Attorney that, if accepted by the Court, provides for a misdemeanor conviction, restitution in the amount of $19,000,000, a United States Sentencing Guidelines fine of $5,000, and a special assessment of $25.[3] In addition, the agreement allows for, but does not require, a sentence of up to five years' probation. The defendants believe that no term of probation is required on the facts of this case, and the government has agreed that if the Court sentences the defendants to a term of probation, it will take no position as to whether any non-standard conditions of probation are appropriate in this case.

**The Court Should Accept the Parties' Proposed Plea Agreement and**
**<u>Impose a Non-Incarcerative Sentence with No Term of Probation</u>**

Title 18, United States Code Section 3553(a) provides that in imposing sentence the Court should consider "the nature and circumstances of the offense and the history and characteristics of the defendant" as well as:

> the need for the sentence imposed (A) to reflect the
> seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense; (B) to
> afford adequate deterrence to criminal conduct; (C) to
> protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or

---

[3]    In accordance with the parties' plea agreement, each of these payments has already
been made. (PSR ¶ 82.)

> vocational training, medical care, or other correctional
> treatment in the most effective manner[.]

18 U.S.C. § 3553(a). Applying these factors to this case, it is apparent that the sentence

contemplated by the parties' plea agreement is sufficient to meet the stated goals of

Section 3553(a). The Court, accordingly, should accept the parties' proposed plea

agreement, and impose a non-incarcerative sentence with no term of probation.

With respect to the nature and circumstances of the offense, we are aware

that the Court has received many letters describing the suffering that OxyContin

addiction and abuse have caused in this District and around the country. It is undisputed

that prescription drug abuse — and OxyContin abuse in particular — has caused

tremendous suffering among addicts and their families. It is equally undisputed that this

harm has not been spread evenly across the United States, and that some communities,

like this one, have suffered more than others. But for several reasons, we believe that this

suffering is not a proper measure of the "nature and circumstances of the offense" to

which Michael Friedman pled guilty.

First, consideration of the "nature and circumstances of the offense" must

take into account the level of culpability associated with the conduct at issue. In this

case, as set out in detail above, the offense at issue, as it relates to the individuals,

involved no intent to harm or deceive. Accordingly, the basic premise of sentencing law

— that criminal conduct involves culpability and blameworthiness that must be punished

— simply does not apply in this case. Second, attempts to measure the suffering caused

by OxyContin addiction do not take into account the overwhelming contributions that

OxyContin has made to the treatment of pain over the last decade.  As set forth in detail

in Purdue's sentencing submission, OxyContin is an extraordinary drug that has changed

untold lives for the better.  Press reports and letters from the public notwithstanding,

OxyContin is not a drug like cocaine or heroin that has no therapeutic value.

As a result, and when viewed as it must be in the context of Purdue's

larger efforts to bring life-altering pain relief to a class of patients who had previously

been ignored, the "nature and circumstances of this offense" assume an entirely different

and far more benign character.  The fact that the actions (or inactions) that gave rise to

this plea occurred in the context of an enormous and well-intentioned effort to bring pain

relief to previously untreated patients provides a strong reason for a non-incarcerative

sentence that includes no sentence of probation.

The "history and characteristics of the defendant" in this case likewise

support acceptance of the plea agreement and sentence that includes neither incarceration

nor probation.  Michael Friedman, we submit, is among the unlikeliest people to find

himself before this Court facing a criminal charge of any kind.  Everything about his

background, from his childhood to his adult years, suggests nothing but respect for the

law, devotion to his family, and generosity toward his community.

Michael Friedman was born in Brooklyn, New York, on January 29, 1949.

He is now 57 years old.  His mother Lily, now 83, and his late father Ludwig, both

Holocaust survivors, met in a displaced persons camp in Europe and immigrated to the

United States after World War II.[4]

Michael's parents settled in Brooklyn, New York, where Ludwig became

a butcher.  Together they raised three children (Michael, his brother Ira, and his sister

Miriam) in a working class environment.  Michael's family history and his upbringing

impressed upon him what has been repeatedly described as a fundamental sense of right

and wrong.  In a letter to the Court that is attached as Exhibit D to this submission,

Michael's brother, Ira, describes the effect that their family history had on Michael as

follows:

> Our parents' moral compass was strong enough to
> withstand the overwhelming evil of the Holocaust.  They
> established the ethical standard upon which we cut our
> teeth, and I can assure you — that standard is one to which
> Michael is devoted.  Everyone who actually knows him —
> family, friends, even business colleagues — loves and
> admires him.  That's because he is scrupulously honest,
> unsparingly generous, and ethically committed …. he is,
> indeed, both good and true.

(Letter from Ira Friedman, attached as Exhibit D.)  Others have noted the effect that these

childhood lessons had on Michael as he grew older:

> His mom and dad were Nazi prison camp survivors, whom
> I came to know quite well.  I could see that there was never
> confusion with them regarding what was right or wrong,

---

[4]   Michael's parents were married while still interned in a refugee camp in Europe.  His
parents recounted how, in the absence of cloth to make a wedding dress, his father
traded two pounds of coffee for a parachute, and his mother traded two packs of
cigarettes to have the parachute sewn into a white dress.  That dress is now on display
in the National Holocaust Museum in Washington, D.C.

> honest or dishonest, and that this perspective was passed on
> to Michael, and reinforced by example.

(Letter of Theodore M. Antonitis, attached as Exhibit B.)

Michael remained in Brooklyn for college, graduating from Brooklyn College with a degree in fine arts in 1970, and shortly thereafter became a high school teacher in Dear Park, Long Island. One year later, he took a job as a salesman at Hilti Fastening Systems, a Connecticut-based manufacturer of power tools, drills, and fasteners. Michael started at Hilti as a Marketing Assistant, selling Hilti products on construction sites. Over time, he rose to become a Vice President of Marketing.

At the same time, and highlighting a passion for learning and for bettering himself that would continue throughout his life, Michael continued his education. He enrolled at the University of Connecticut in 1972, and, taking classes at night while working full time, earned an M.B.A. in 1976. Years later, after joining Purdue and rising through its ranks to become the company's President and CEO, Michael again went back to school, juggling the demands of a family and a full-time job with the desire to continue to better himself. These efforts led to a Doctorate in Professional Studies from Pace University in New York in 2006.

Michael's continuing efforts to educate himself were not an exercise in collecting awards or accomplishments. They were, rather, a reflection of a genuine interest in bettering himself and contributing to the education of others. As his friend John Ashe recalls:

> While studying for his [D.P.S.] degree, [Michael]
> volunteered to teach an undergraduate course in Sales and
> Marketing to night school students. Michael was not
> compensated for this work. He taught the course to enjoy
> the interaction with his students. I found his commitment
> to the pursuit of excellence and the standard to which he
> holds himself remarkable.

(Letter from John C. Ashe, attached as Exhibit A.) And while Michael was already an

accomplished businessman who did not need to take classes to further his career, he

never took the opportunity to educate himself for granted, and always took his studies

seriously. Again, his friend John Ashe recalls calling Michael over the weekend to get

together for a cup of coffee, and Michael responding, "I'd love to, Johnny, but I'm going

to be studying all weekend." (*Id.*)

The fact that Michael's successes as a businessman have not distracted

him from the core values he gained from his parents is further reflected in his

extraordinary commitment to community service. Virtually every letter sent to the Court

on his behalf highlights the remarkable commitments that Michael has made (and

continues to make) to his community. His generosity in this respect has been recognized

through countless awards and honors, including a "Heart of Gold" award given annually

by the Volunteer Center of Southwestern Fairfield County to a single individual who best

embodies the spirit of "corporate social responsibility." (*See* Letter of John P. Condlin,

President and C.E.O. of the Stamford, Connecticut Chamber of Commerce, attached as

Exhibit C.)

Perhaps most importantly, Michael Friedman's contributions to his community cannot be measured only in dollars. As noted in the attached letters, Michael has consistently shown his willingness to "roll up his sleeves" and volunteer his time, attention, and expertise to his community. Len Miller, a long time friend of Michael's, notes that:

> Over the years I have worked with many business leaders who because they are very busy often promise more than they actually deliver …. Not so with Michael. He has always been there when needed, and has never wavered from his commitment[.]

(Letter from Len Miller, attached as Exhibit H.) Michael's friend John Ashe describes it in simpler but no less descriptive terms: "Michael showed up, and he got things done."
(Exhibit A.)

Perhaps not surprisingly, Michael brought the same sense of altruism and community service to Purdue. As John Condlin writes:

> When Mr. Friedman assumed the position of President & CEO at Purdue Pharma, he instituted a policy whereby community involvement was a top priority of their core values. The company encourages its employees to serve as volunteers in social and civic organizations and provides both financial and human resource support.

(Exhibit C.) Patricia Leigh, a retired Purdue Vice President, notes that under the leadership of both Michael Friedman and Howard Udell, Purdue employees:

> were encouraged to become involved in community outreach programs, especially to support non-profit organizations dedicated to health, welfare and education. Every member of the Human Resources staff volunteered to serve organizations involved in support of children, the elderly, and those in need of affordable housing or

> advanced education. We didn't just serve on Boards or
> donate money, we worked at fund-raisers, we "adopted"
> grade school children who needed help beyond that
> available at home, and we provided in-kind services such as
> printing. . . . . Purdue is well-known and recognized as
> generous good neighbor in the local communities.
>
> These practices[,] which began under the founding
> family[,] have been encouraged and have grown under the
> stewardship of Howard Udell and Michael Friedman.

(Letter of Patricia L. Leigh, attached as Exhibit F.)

Together with Howard Udell, Michael embraced a corporate philosophy of

"doing the right thing" that is reflected is so many of the letters written on Michael's

behalf. Ironically in light of the charges in this case, Michael and Howard personally

organized and participated in a series of initiatives specifically designed to address the

growing problem of OxyContin drug abuse, and of prescription drug abuse generally.[5]

Aaron Graham, a former D.E.A. Special Agent who was hired personally by Michael to

develop corporate security and prevent the theft and diversion of OxyContin writes that:

> When I first met Michael during the interview process, I
> remember thinking how candid and straightforward he was

---

[5] Past and present Purdue employees consistently recount how Michael and Howard's
philosophy of "doing the right thing" became a way of doing business at Purdue.
Ronald Levine, for example, writes that: "I have known Mr. Friedman since he joined
Purdue Pharma. He is one of the most intelligent men I have ever met. In addition,
his moral character is outstanding and throughout my entire time at the company, I
was exposed to multiple meetings or personal discussions where Mr. Friedman
stressed the need to do the correct thing and to comply with every regulation[.]"
(Letter from Ronald D. Levine, attached as Exhibit G.) Edward Mahony, Purdue's
CFO, citing examples of Michael's commitment to anti-abuse initiatives, states that
"Michael is a great man who always does the right thing[.]" (Letter of Edward B.
Mahony, attached as Exhibit K.)

> about the challenges facing OxyContin as a medicine that
> was being abused and misused.  He was equally
> straightforward in stating that it would not be an easy job,
> but one that would prove personally rewarding.  He also
> stressed our responsibility to ensure that the medicine was
> always available for legitimate patients and how we had to
> do all we could to ensure that drug abusers and other
> criminals were never allowed to dictate healthcare policy in
> America …. I was inspired by Michael's passion and
> enthusiasm.  After that interview, I went home and told my
> wife that if offered the job, I would take it just to work for
> Michael Friedman.

(Letter from J. Aaron Graham, attached as Exhibit E.)

In his letter to the Court, former Special Agent Graham recounts some of the extraordinary steps that Michael implemented at Purdue to combat abuse and diversion at every stage of the manufacturing and sales process.  These efforts included, among many others, the decision not to engage in direct-to-consumer advertising; the development of a Law Enforcement Liaison and Education Unit dedicated to training federal, state and local law enforcement agents in anti-abuse and diversion tactics; and the development, at Purdue's expense, of "the nation's first and only information clearinghouse to collect, collate and disseminate information regarding patterns and trends involving the theft of prescription and [over-the-counter] medicines."  (*Id.*)

Again, however, Michael's efforts to combat abuse and diversion did not stop with the allocation of Purdue funds.  As Edward Mahony writes:

> [W]hen the OxyContin abuse situation came to Michael's
> attention, I was Chief Financial Officer at Purdue.  I saw
> first hand Michael spring into action and create from the
> ground up dozens of programs that are still in place today
> to help reduce the risk of abuse and diversion.

(Exhibit K.)  And Michael, together with Howard Udell, personally traveled around the

country to meet with law enforcement agents in an effort to better understand and address

the growing nationwide prescription drug abuse problem.[6]  As former DEA Special

Agent Graham writes in wrapping up his remarkable letter:

> [I]t is not typical for the Chief Security Officer to report
> directly to the CEO, but that was the importance Michael
> put on his commitment to the function.  I've received
> hundreds of letters, e-mails, telephone calls and awards
> lauding Purdue Pharma's efforts at patient safety, product
> integrity and supply chain security.  The pharmaceutical
> industry has followed Purdue Pharma's lead in many of the
> initiatives highlighted above and the American public is
> safer today because of Michael Friedman's dedication,
> foresight, vision and unselfish commitment to doing the
> right thing.  I've been blessed to meet and work with
> Michael and I pray and hope that you'll take my comments
> into consideration when you execute your responsibility as
> the presiding Judge in this matter.

(Exhibit E.)

Finally, and in what is perhaps the most fundamental recognition of

Michael's sense of purpose and community, those who know Michael best recognize him

for his love of and devotion to his family.  Michael has been married to his wife Lois

since 1972, and together they have two grown children: Daniel, age 31, and Sarah, age

---

[6]   Statements made in the media in the context of the guilty pleas entered in this case
have suggested that the abuse and diversion of OxyContin created profits for the
company and higher pay for its executives by increasing sales of the drug.  As Purdue
executives (including Michael Friedman) were well aware, however, the opposite was
true.  As abuse of the OxyContin spread, physicians became less willing to write
prescriptions, and overall sales of OxyContin slowed.  The suggestion that Purdue or
any of the executives profited from abuse and diversion is demonstrably false.

26.  His friends and colleagues consistently cite Michael's love for his family as one of

his defining characteristics.  John Ashe, for example, writes that:

> First and foremost, Michael is a devoted, loving husband
> and father.  His guidance of his children Sarah and Daniel
> is gentle and caring, helping his daughter throughout her
> music career and his son in his consulting business.  He
> focuses on helping and nurturing other young adults as
> well, with wonderful assistance and advice over time to my
> children ….Those roots of thankfulness, service to others,
> persistence of effort, providing a safety net for the next
> generation are all the foundation on which Michael has
> built a life.

(Exhibit A.)

In sum, we believe that Michael Friedman's conduct and character, as

reflected in the PSR, in this submission, and most importantly in the manner in which he

has conducted himself over the years, weigh heavily in favor of the Court's acceptance of

the parties' plea agreement and a non-incarcerative sentence.

**A Term of Probation Is Not Required in This Case**

If the Court elects to accept the individual defendants' pleas pursuant to

the parties' plea agreements, it will need to decide whether to impose a term of probation.

We believe that no period of probation is required on the facts of this case.

The entry of Michael Friedman's guilty plea and the surrounding (often

incorrect) press it has generated have weighed greatly on him.  He has been portrayed in

national and local newspapers as a criminal and a "drug dealer."  Whatever the sentence

imposed, his reputation will never be the same, and he will always carry with him the

stigma of a criminal conviction.  None of the legitimate purposes of probation support a

term of probation in this case: Michael Friedman does not need to be rehabilitated or re-educated or reintegrated into society. Neither travel restrictions nor reporting requirement nor any other condition of probation can reasonably be said to serve a legitimate penalogical function in this case.

Based on the foregoing, we respectfully submit that Michael Friedman is a hard working, decent, and dedicated family man who has long dedicated himself to trying to be a good son to his parents, a good husband to his wife, a good parent to his children, and a good citizen to his community. If his plea is accepted, he will stand convicted of a crime, and he has already been pilloried — often wrongly and maliciously — in the press. On the facts of this case, no more punishment is needed. We respectfully ask that the Court accept the parties' plea agreement, and impose on Michael Friedman a non-incarcerative sentence with no term of probation.

Respectfully submitted,

Mark F. Pomerantz
Roberto Finzi
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3010
Fax: (212) 373-2769

Enclosures

cc:     AUSA Rick A. Mountcastle (by e-mail)
        AUSA S. Randall Ramseyer (by e-mail)
        Senior U.S. Probation Officer W. Greg Lambert (by e-mail)

# EXHIBIT A

June 14, 2007

The Honorable James P. Jones
Chief Judge, United States District Court
Western District of Virginia
180 West Main Street
Abingdon, Virginia 24212-0669

Dear Honorable Chief Judge Jones:

I am privileged to tell you about my deep and valued friendship with Michael Friedman. I met Michael and his wife Lois twenty years ago when our daughters were classmates at the Bi-Cultural Day School in Stamford, CT. Our families shared a common bond then, and it grew and expanded, and my friendship with Michael has become a mainstay in my life. I am blessed to have our honest and true friendship.

First and foremost, Michael is a devoted, loving husband and father. His guidance of his children Sarah and Daniel is gentle and caring, helping his daughter throughout her music career and his son in his consulting business. He focuses on helping and nurturing other young adults as well, with wonderful assistance and advice over time to my children. The love of family and extended family comes from his roots. I have often spoken with Michael about our shared European heritage, learning from him about his father and mother, both of whom escaped from the Holocaust to come to the U.S.A. and build a life here. The stories of survivors are fundamental. Those roots of thankfulness, service to others, persistence of effort, providing a safety net for the next generation are all the foundation on which Michael has built his life.

Michael is a businessman of the highest integrity and character. As a Vice President, Global Private Client at Merrill Lynch for twenty-four years, I have been privileged to work with Michael. We often discuss ideas and explore our own "think tank" on the world, the economy and the future. I have the highest regard for his character, ethics, judgment, intellect and opinion. A few years ago Michael decided to pursue a doctoral degree in Professional Studies in Business at Pace University. While studying for his degree, he volunteered to teach an undergraduate course in Sales and Marketing to night school students. Michael was not compensated for this work. He taught the course to enjoy the interaction with his students. I found his commitment to the pursuit of excellence and the standard to which he holds himself remarkable. Sometimes I would call him up over the weekend to perhaps just get together for a cup of coffee and to chat, and often Michael's response was, "I'd love to, Johnny, but I'm going to be studying all weekend." The persistence of effort in reaching his goal is a reflection of his dedication to improving himself and the world around him.

Our community, not only in Stamford but also in the world at large, would not be the same were it not for the consummate dedication, generous support, ideas, energy, and highest ethical standards that Michael has brought to outside organizations. He has served as a member of the Board for six years and Chairman of the Board for two years of the Business Council of Fairfield County (Connecticut), member of the Board of Trustees at the Bi -Cultural Day School, Congregation Agudath Sholom, the Berklee College of Music, and on the Honorary Board of Soundwaters and Chairman of the Honorary Board of the Child Care Learning Centers. Michael has received numerous awards in the community, including the Heart of Gold Award given to him from the Volunteer Center of Connecticut in 2005 at a dinner I attended along with over 300 people, including many established business and political leaders. He also received the Walter Wheeler Award from the Business Council of Fairfield County last year. I saw Michael at work in and on behalf of the community. When he and I worked together on the Bi-Cultural Board, we sat for hours, both in meetings and on our own, to help develop a strategic plan for the School and also co-ordinate fund-raising efforts to build a new wing. In addition, I know that two years ago Michael was a member of the Rabbinical Search Committee at Agudath Sholom and worked

tirelessly to identify and hire a new rabbi, a most important decision for the future of this Congregation. Michael showed up, and he got things done. Every organization and the individuals associated with them has benefited from his wisdom and guidance.

Michael is loved by family and friends. He is highly respected by business and community associates and by his employers and his employees. He is a man who is able to communicate with everyone -truly a man for all seasons. Finally, he is very much admired, respected and loved by me, his good friend, for so many years.

Respectfully,

John C. Ashe

# EXHIBIT B

June 8, 2007


Theodore M. Antonitis
**REDACTED**



The Honorable James P. Jones
Chief Judge, United States District Court
Western District of Virginia
180 West Main Street
Abingdon, Virginia 24212-0669


Your Honor:

The purpose of my letter is to share my impression of the character, personality, and behavior of Michael
Friedman, who will be appearing before you July 20, 2007. I appreciate you taking the time to read my
comments.

Regarding the writer, I am a sixty-two year old who served honorably as a Navy aviator during the
Vietnam era. During the past thirty-seven years in the workforce, I have progressed from a territory
salesman in the construction industry to the president and CEO of two moderate size public companies
outside the pharmaceutical industry. Over the course of my career I have been described as a "straight
arrow." Being honest is important to me and I pledge that what I say about Michael Friedman is
completely true and unembellished.

I have known Michael for approximately thirty-five years. We have been employed in the same
companies, or by the same business owners, for a large portion of that time. Before Michael joined
Purdue Pharma, I worked directly for him, for over eight years at a director and then vice president level,
and got to know him very well professionally. That association led to a deep friendship.

For the past thirty plus years Michael has been my closest friend, really more like a brother to me than
any other friendship. Twenty five years ago I chose Michael over close family and friends to be the Best
Man at my wedding. We have remained in close weekly contact for over three decades, and have openly
shared views and experiences, and drawn on each other regarding virtually every critical aspect of our
roles as fathers and businessmen. There is no one I know and understand better than Michael Friedman.
Based on this knowledge, I would like to point out the following.

Michael is as pleasant and generous a person as one could imagine. Even under the most difficult circumstances, I have never seen him resort to any degree of malice or become bitter. He has always given people the benefit of the doubt and shown kindness. He is someone who responds to life's lessons by seeking to improve himself, not by blaming others. For as long as I have known him, he has routinely extended a helpful hand, generous of his time and money, to friends, colleagues, organizations, and communities. He never asks for anything back.

Michael Friedman is a consistently honest and honorable person at all levels. His mom and dad were Nazi prison camp survivors, whom I came to know quite well. I could see that there was never confusion with them regarding what was right or wrong, honest or dishonest, and that this perspective was passed on to Michael, and reinforced by example. The business and personal options Michael has discussed with me, and the choices he has made over the years, have shown that he always chooses doing the right thing and doing things right over any other alternatives. With Michael, anything less has never been and option.

Michael is also the smartest person I know intellectually and practically. His application of this gift has always immensely benefited the three business constituencies he has served, customers and employees first, and subsequently, shareholders. Outside of business, I have seen Michael frequently use his extraordinary intellect to help people find better solutions for themselves. He is someone who makes people he talks with and works with feel smarter and more confident.

I think it inappropriate for me to comment here on the details of the case. What I can say without hesitation, is that Michael Friedman would not knowingly do anything wrong, and that he always manages his responsibilities honestly and responsibly to the maximum extent possible. In the nearly forty years I have known him I have never, ever, seen Michael engage or even hint at engaging in any activity that he would consider wrong or improper. I know Michael extremely well and vouch for him with absolute conviction.

Your Honor, Michael Friedman is simply the best man I know. He is someone who I believe deserves all of Your Honor's compassion, particularly to the extent he finds himself before the Court based on activities of others that I am sure he would have tried to prevent if he had known about them. Thank you for the opportunity to submit this letter.


Respectfully,

Theodore M. Antonitis

Theodore M. Antonitis

# EXHIBIT C



733 Summer Street Suite 104  Stamford CT 06901 Telephone: 203.359.4761 Fax: 203.363.5069
www.stamfordchamber.com

June 11, 2007

The Honorable James P. Jones
Chief Judge, United States District Court
Western District of Virginia
180 West Main Street
Abingdon, Virginia 24212-0669

Re: Michael Friedman

Dear Honorable Jones:

Please accept this letter of support for Michael Friedman, President and CEO of Purdue Pharma. I have known Mr. Friedman for nearly ten years in his position as president and CEO. He has been an active member of the Stamford community, in both the business and resident segments. He has lent his leadership skills to community challenges, whether it required his personal time or the assistance of Purdue Pharma. Mr. Friedman exemplifies a person who truly understands the importance of civic engagement.

His community involvement was publicly recognized when he received the prestigious Heart of Gold Award for his work in the community. This annual award is given by a coalition of non-profit organizations to an individual who demonstrates corporate social responsibility. Mr. Friedman was the perfect candidate and recipient of this award.

Mr. Friedman's community support includes serving on many boards and councils including the Bicultural Day School, the Connecticut Coalition for Achievement Now, the SoundWaters, the Stamford Symphony and the Leadership Council of the Childcare Learning Centers, to name a few.

When Mr. Friedman assumed the position of President & CEO at Purdue Pharma, he instituted a policy whereby community involvement was a top priority of their core values. The company encourages its employees to serve as volunteers in social and civic organizations and provides both financial and human resource support. A Purdue Pharma employee serves on the Stamford Chamber of Commerce Board of Directors.

In addition to Mr. Friedman's work in the Stamford community, I have traveled to Washington DC on several occasions with him and a contingent of business and political leaders to meet with our legislators to discuss the challenges that a city the size of Stamford encounters. He has worked diligently with the delegation to make sure federal legislators are fully aware of Stamford issues and the support needed from the legislative body.

In summary Mr. Freedman's outstanding performance history in our community speaks volumes for the kind of committed and caring individual the he is.

Thank you for allowing me to send this letter in support of Michael Friedman.

Sincerely,

John P. Condlin
President & CEO

# EXHIBIT D

Ira Friedman

**REDACTED**

6/7/07

The Honorable James P. Jones
Chief Judge, United States District Court
Western District of Virginia
180 West Main Street
Abingdon, Virginia 24212-0669

Your honor,

I am Michael Friedman's younger brother. Rarely have I, as an ordinary citizen, been privy to the truth about any individual who's been the subject of extensive media coverage. But in this particular case, I've accumulated 57 years of expertise.

So, here's the truth about Michael Friedman:

If we have a sibling rivalry, it is in who comes closer to doing the right thing without becoming self-righteous. Our parents' moral compass was strong enough to withstand the overwhelming evil of the Holocaust. They established the ethical standard upon which we cut our teeth, and I can assure you - that standard is one to which Michael is devoted. Everyone who actually knows him – family, friends, even business colleagues – loves and admires him. That's because he is scrupulously honest, unsparingly generous, and ethically committed. He may sound too good to be true, but he is, indeed, both good and true.

He has enriched everyone around him, providing guidance and opportunity for his employees, leadership for the Stamford volunteer community, and significant support for research scientists, teaching universities, and hospice nurses on the state, local and national levels. As a result, I have been quite unproductive for the last few weeks because of the numerous phone calls, personal visits and letters of support that I've received on his behalf.

Sensationalist journalists have tried to lump him in with the standard corporate malefactor stories that have become all too routine. But by doing so, the media have done

him a terrible injustice, and I, for one, have been terribly disappointed as a result. Michael, instead, given his goal-orientation, creativity and vision, will focus on future accomplishment, improving people's lives, and fixing what's wrong.

I'm confident that ultimately, his rock-solid citizenship, heartfelt humanity and deep-rooted principles will prevail, and make themselves apparent to you as you consider his case.

Thank you.

Respectfully,

Ira Friedman

# EXHIBIT E

 **TM**

**Purdue Pharma L.P.**

**J. Aaron Graham**
*Vice President & Chief Security Officer*
*Corporate Security*

1 Stamford Forum
Stamford, Connecticut 06901-3431
www.purduepharma.com

Phone: (203) 588-8454
Fax: (203) 588-6088
aaron.graham@pharma.com

June 6, 2007

The Honorable James P. Jones
Chief Judge, United States District Court
Western District of Virginia
180 West Main Street
Abingdon, Virginia 24212-0669

**Re: Michael Friedman**

Dear Judge Jones:

My name is J. Aaron Graham and I'm writing to you about Mr. Michael Friedman. Allow me to begin by telling you that I'm a former Senior Special Agent with the US Drug Enforcement Administration (DEA) where I successfully completed tours of service in San Francisco, CA, Guadalajara, Jalisco, Mexico and Tucson, AZ. I subsequently served as a senior Special Agent - Team Leader for the FDA – Office of Criminal Investigations. During my career in federal law enforcement, I received many awards and accolades, including last year when I was recognized by the American Police Hall of Fame, receiving both their Award of Honor and The President's National Medal of Patriotism. I share this with you as a point of reference as I tell you about my relationship with Michael Friedman.

I currently serve as the Vice President and Chief Security Officer for Purdue Pharma L.P. where I report directly to Michael. In my 24 years of conducting criminal and security investigations throughout the world, I've been fortunate to meet many intelligent men and women of high integrity and great courage. Michael Friedman is that rare individual who possesses extraordinary intelligence, courage and personal integrity. When I first met Michael during the interview process, I remember thinking how candid and straightforward he was about the challenges facing OxyContin as a medicine that was being abused and misused. He was equally straightforward in stating that it would not be an easy job, but one that would prove personally rewarding. He also stressed our responsibility to ensure that the medicine was always available for legitimate patients and how we had to do all we could to ensure that drug abusers and other criminals were never allowed to dictate healthcare policy in America. As a former college football player and coach, as well as a DEA SWAT agent, I was inspired by Michael's passion and enthusiasm. After that interview, I went home and told my wife that if offered the job, I would take it just to work for Michael Friedman. It's important to point out that at the time I was not looking for a new job as I had a great position as Director of Global Security for Pfizer Inc.

Upon accepting the position in July 2002, Michael challenged me to build an industry leading corporate security team. In response to his challenge, and with his financial backing and support, I hired industry experts in facility security, product integrity (diversion control and anti-counterfeiting), supply chain security and law enforcement education. To address the age old problem of pharmacy crime, we developed the nation's first and only information clearinghouse designed to collect, collate and disseminate information regarding patterns and trends involving the theft of prescription and OTC medicines (www.rxpatrol.org). RxPATROL has documented approximately 3,000 incidents of pharmaceutical theft since its inception in May 2003. RxPATROL, fully funded by Purdue Pharma and in partnership with Crime Stoppers programs throughout the nation, has aided in more than 32 arrests in the same time frame and has received numerous awards, including FBI LEEDA's first ever Innovation Award in 2005. As you well know, there were pharmacy robberies and burglaries long before OxyContin was approved by the FDA, but Michael asked me to make this project a priority to demonstrate our commitment to pharmacy safety and the availability of important medicines for legitimate patients.

*Dedicated to Physician and Patient*

Michael also challenged me to figure out how we could secure our manufacturing facilities to mitigate the possibility of theft and diversion within our plants. We responded by becoming the first pharmaceutical manufacturing company in the US to construct a comprehensive site security protocol that included color-coded pocket less uniforms, fully integrated CCTV-Alarms, biometrics fingerprint readers and "Vegas" style cameras. In order to address another of Michael's fears, that of counterfeit medicines infiltrating legitimate commerce, we changed our label design to add overt and covert features that can enable pharmacists and law enforcement to detect fraudulent medicines in the supply chain.

Michael then turned his attention to doing everything we could to track our product through the legitimate supply chain, mitigating the risk of diversion even beyond where we had physical control of the medicine. By implementing a fully comprehensive track and trace program using Radio Frequency Identification (RFID) at the item level, we became the first pharmaceutical company in America to successfully complete a pilot of this protocol. At the cost of several million dollars, we continue to expand our RFID protocol even though it is not required, but because it's the right thing to do. In 2006, we also became the first pharmaceutical company in America to begin tracking our shipments utilizing covert package-sized GPS tracking devices. These devices enable us to track our large shipments every minute from the time they leave our plant to the time they arrive at the customer's address. We also began working aggressively with law enforcement and regulatory agencies globally to address the ever-increasing threat of prescription medicines being diverted and sold via the internet. We've worked closely with law enforcement officials throughout the US and referred dozens of websites suspected of unlawfully distributing controlled medicines via the internet. Once again I'll point out that none of this was required and it all began before we became aware of the litigation under way in Virginia.

With Michael's support, we also built the premier Law Enforcement Liaison and Education unit in our industry. The group is comprised of four former law enforcement professionals with more than 100 years experience conducting criminal investigations, and more importantly with extensive experience conducting prescription drug diversion investigations. This unit trains law enforcement personnel, physicians, nurses, pharmacists and other healthcare practitioners throughout the country in the "non-branded" programs that focus on how diversion occurs, how pharmacists and physicians can protect their practices, what pill seekers are looking for, how doctor shoppers ply their trade, ...etc. To my knowledge, Purdue Pharma is the only pharmaceutical company in the country with a team of law enforcement professionals exclusively dedicated to this task. And once again, this unit was initiated before we became aware of the litigation under way in Virginia, is completely funded by Purdue Pharma and is supported by Michael Friedman because it's the right thing to do.

In summary, I'll add that it is not typical for the Chief Security Officer to report directly to the CEO, but that was the importance Michael put on his commitment to the function. I've received hundreds of letters, e-mails, telephone calls and awards lauding Purdue Pharma's efforts at patient safety, product integrity and supply chain security. The pharmaceutical industry has followed Purdue Pharma's lead in many of the initiatives highlighted above and the American public is safer today because of Michael Friedman's dedication, foresight, vision and unselfish commitment to doing the right thing. I've been blessed to meet and work with Michael and I pray and hope that you'll take my comments into consideration when you execute your responsibility as the presiding Judge in this matter.

Regards,

J. Aaron Graham
Vice President & Chief Security Officer
Purdue Pharma L.P.

*Dedicated to Physician and Patient*

# EXHIBIT F

Patricia L. Leigh

**REDACTED**

May 26, 2007

The Hon. James P. Jones
Chief United States District Judge
Western District of Virginia
United States District Court
180 West Main Street
Abingdon, Virginia 24011

Re:

Your Honor,

I am writing in connection with the above proceedings. I am a retired Vice President, Human Resources and Administrative Services, Purdue Pharma, LP. I served in the Human Resources function for almost thirty years during which time I reported to Purdue's first President, then to Howard R. Udell, and later to Michael Friedman. I was honored to be named the first female Vice President of the Company in the late 1970's, many years before most companies were welcoming women into executive positions. This is only one example of the moral and ethical standards Purdue has always practiced.

We were encouraged to become involved in community outreach programs, especially to support non-profit organizations dedicated to health, welfare and education. Every member of the Human Resources staff volunteered to serve organizations involved in support of children, the elderly, and those in need of affordable housing or advanced education. We didn't just serve on Boards or donate money, we worked at fund-raisers, we "adopted" grade school children who needed help beyond that available at home, and we provided in-kind services such as printing. We provided scholarships for nursing students at the local Community College. As the company grew, many colleagues other than the members of Human Resources joined in these efforts. Purdue is well-known and recognized as a generous good neighbor in the local communities.

These practices which began under the founding family have been encouraged and have grown under the stewardship of Howard Udell and Michael Friedman. They are honorable and compassionate men, respected in their professions, in their home communities and deeply loved by their families and friends. I am proud to have worked with them and honored to be numbered among their friends.

Respectfully,

Patricia L. Leigh

# EXHIBIT G

May 28, 2007

The Honorable James P. Jones
Chief, U.S. District Judge
Western District of Virginia
United States District Court
180 West Main St.
Abingdon, VA 24011

Dear Judge Jones:

This letter is in reference to proceedings which are presently before you relating to Purdue Pharma LP and Mr. Michael Friedman, Mr. Howard Udell and Dr. Paul Goldenheim.

I am a past employee of Purdue Pharma, having retired more than a year ago after working for that organization for 45 years. I have known Mr. Friedman, Mr. Udell and Dr. Goldenheim for many years.

The accepted policy of the company was a dedication to the physician and patient to provide the best and most effective medication. In providing those medications, it was constantly stressed on the requirement to comply with the package insert and not to say or do anything that was not authorized or correct. In my experience, the company always took a very conservative approach, was extremely careful and always attempted to do the right thing to be sure that the medications were used correctly and the physicians or other health care professionals were kept informed.

I have known Mr. Friedman since he joined Purdue Pharma. He is one of the most intelligent men I have ever met. In addition, his moral character is outstanding and throughout my entire time with the company, I was exposed to multiple meetings or personal discussions where Mr. Friedman stressed the need to do the correct thing and to comply with every regulation His concern over the problems that resulted from the misuse of the medication were of major importance so he constantly gave direction to be sure that the corrective action would be taken. This is the individual you would want to have as a friend, as a neighbor and as a colleague.

Mr. Udell is considered the heart and soul of the organization. In my entire career, I never experienced a single incident where he did not do the right thing. His concern for people, to be sure that the company was held to the highest of standards and to instill a sense of correctness was his only way of doing his job as the main legal officer of the company. There would never be a time when he did not do everything to be sure that every employee met every requirement to meet the highest standards of the industry.

I did not have as much interaction with Dr. Goldenheim. But, in my experience he always stressed that the correct and complete information about the products should be

communicated. He made sure that the entire organization understood as much as was known about the medication so that everyone had access to the approved documentation.

These individuals led the organization in a manner that gave you pride in your work. They always stressed the necessity to be sure that the complete information was communicated, that we were in compliance in every situation and that we would do everything possible to be sure that we were providing a benefit to millions of patients, but in the right way.

Sincerely,

Ronald D. Levine

**REDACTED**

# EXHIBIT H


O'Connor Davies Munns & Dobbins, llp
ACCOUNTANTS AND CONSULTANTS

June 5, 2007

The Honorable James P. Jones
Chief Judge, United States District Court
Western District of Virginia
180 West Main Street
Abingdon, Virginia 24212-0669

Dear Judge Jones:

I am a friend of Michael Friedman, the CEO of Purdue Pharma. I have gotten to know Michael quite well as we have been involved in a great deal of community work in this region and in Stamford, Connecticut. Michael and I as other members of the business community have been involved in improving the environment, particularly in Long Island Sound, and also in helping to close the achievement gap that exists in Stamford between white children, and children of color. Michael is also involved in other community activities that I am not personally involved with.

There are two major points I would make about Michael. One is the high level of commitment that Michael makes when he gets involved in a community issue. Over the years I have worked with many business leaders who because they are very busy often promise more than they actually deliver. I believe they mean well but their priorities are such that they commit to more than they can do. Not so with Michael. He has always been there when needed, and has never wavered from his commitment or his support. He therefore has been invaluable in moving these issues along to possible positive conclusions and resolution.

The second point I would make about Michael Friedman is his high level of integrity. He is a man I trust greatly, and has always been a man of his word. I am often involved in fundraising efforts and for most people I prefer to have their pledges in writing. With Michael, I have never even considered that as I knew by experience and instinctively that he would fulfill his commitments without hesitation. I know that the people who have worked in this community with Michael would wholeheartedly agree with me.

Michael is a man that I have come to count on when needed, to trust him unequivocally with responsibilities, and to know that he will work with you to accomplish what needs to be done. I have very high regard for him and he has been and I know will continue to be a great asset to Stamford and to the region.

Sincerely,

Len Miller
Partner

One Stamford Landing, Stamford, Connecticut 06902   203.323.2400 tel   203.967.8733 fax   www.odmd.com

# EXHIBIT I

The Honorable James P. Jones
Chief Judge, United States District Court
Western District of Virginia
180 West Main Street
Abingdon, Virginia 24212-0669

Your Honor,

Michael Friedman soon will appear before you, and I want to add my name to those who most respectfully wish to speak on his behalf. Indeed, if my health would permit, I would gather names on a proclamation, attesting to the high values Michael lives by, every day.

I have known him for 30 years, as the father of two children enrolled in the school at which I was Principal, (recently retired) and for many years and up to the present as a distinguished member of the Board of Trustees. The breadth of his positive influence on matters before the Board is too long to describe.

Consistently, as I observed him interact with his children, their teachers and other parents, I grew to admire his ability to focus on the broad issues, to deflect personal advantage, and always, always, to guide others to a decision that was right and just. He has been a role model for ethical behavior for adults as well as children. In this community he is regarded as an outstanding citizen.

For three decades he has been unselfish with his time and generous with willingness to explore problems and to find solutions. Among his peers he is one whose judgment is sought frequently. Mr. Friedman (Michael to me) sets a standard for allowing others the opportunity to lead, to earn praise, and to test their skills. He is the essence of a good manager.

Whenever Michael's name surfaces in conversation or in reflection, the first word that comes to my mind is honesty. I have always held him in the highest esteem because in every action and deliberation he is man of integrity.

Sincerely,
Walter Shuchatowitz, D.R.E.
Founding Principal
Bi-Cultural Day School

# EXHIBIT J



REAR ADMIRAL FRED S. GOLOVE, USCGR (RET.)

**REDACTED**

July 1, 2007

Dear Judge Jones,

I have known Michael Friedman for more than twenty years. I've known him as a friend, neighbor and family man. At one point, he was my client in making the Purdue organization more effective. I have worked with him in benefiting our local community, where he is very highly regarded.

Throughout our long relationship, he has been a beacon of compassion and fairness, a role model for all of us to follow. He has always been (and I am convinced will always be) a good person of scope beyond anybody else I know. He has often shown how totally committed he is to building and not tearing down, to helping the helpless and not hurting anybody, to "repairing the world" and not causing it any pain ... and much more. And, in the phase he is just completing, without comprising his extremely high personal rules of conduct, he has brought to the world unique products that move comfort and safety forward for millions. I find him to be one of the most amazing and deserving not-quite-rags-to-riches individuals anywhere.

He has always been a role model of humility and goodness for me, and I expect to personally grow and benefit even more from watching him dive into whatever he decides to do next. Michael Friedman is an individual who deserves to be honestly, factually and fairly evaluated by the law and dealt with most kindly and leniently.

Sincerely yours,

Fred S. Golove
Rear Admiral (retired)

The Honorable James P. Jones
Chief Judge, United States District Court Western District of Virginia
180 West Main Street
Abingdon, Virginia 24212-0669

# EXHIBIT K

# EDWARD B. MAHONY
## REDACTED

July 11, 2007

The Honorable James P. Jones
Chief Judge, United States District Court
Western District of Virginia
180 West Main Street
Abingdon, Virginia 24212-0669

Your Honor,

I am writing this letter in support of my friend and colleague Michael Friedman. By way of background, I am the Chief Financial Officer at Purdue. I have worked with Michael since 1993. In those years I have known Michael to be an upstanding leader. He has led this company through difficult times and has had to make many tough decisions. Through it all, Michael has always taken the high road, being guided by one consistent principle -- doing the right thing in all matters.

For example, in 2004 and 2005 Purdue lost a patent decision in a district court and then at the appeals level. As a result, we expected Purdue's sales to drop by over 60% in short order as market share was lost to generic competition. Under Michael's leadership, we had to cut expenses dramatically. It was very painful for Michael personally that some employees had to be let go. Throughout the process, Michael treated those individuals (as well as the ones who stayed) with kindness, respect and dignity. In spite of the trauma of being let-go, many of those individuals remained friends of Purdue, and Michael personally. Through Michael's efforts, as our business recovered, dozens of former employees have been asked to rejoin Purdue. I know that this was a source of great personal pride for Michael -- that he was able to help. This experience speaks both the respect that Michael has for people and the respect that even former employees have for the environment that Michael created as our leader.

Throughout this difficult time, even when cuts had to be made, Michael was steadfast about one program that could not be sacrificed. In 2004, we were looking at all ways to save money in the face generic competition. At that time, Purdue was paying for free medicine, including shipping and processing, for about 10,000 patients recommended by their doctors who otherwise could not pay for their medicine. It was an expensive program. Michael continued to support the program by budgeting scarce resources for it in spite of all the pressure to cut costs. Michael wanted to be sure that these patients did not lose their medicine. Simply put, Michael put patients first.

Indeed, in the years I worked with Michael, one of the greatest sources of pride were the many, many letters of thanks from patients and family members because Purdue medicines "made a huge improvement" in their lives. Michael read each of those letters and they energized Michael because that is what he viewed the business as being all about, making a huge improvement in people's lives.

Finally, when the OxyContin abuse situation came to Michael's attention, I was Chief Financial Officer at Purdue. I saw first hand Michael spring into action and create from the ground up dozens of programs that are still in place today to help reduce the risk of abuse and diversion. Once this came to Michael's attention, he dedicated himself and Purdue to this cause. Again, because he cared -- not just about the bottom line, but about the people who used our products. I know first hand that Michael would never have condoned any inappropriate communications that would have caused a doctor to mis-prescribe the drug or people to abuse OxyContin. That said, he knows that, as our leader, the buck stops with him. By his plea, he accepted responsibility for the conduct of others. I think that is yet another example of Michael's dedication to Purdue, patients and his colleagues. Michael is making this huge sacrifice so that his company, colleagues and patients can put this matter behind us and move forward.

In summary, Michael is a great man who always does the right thing and I feel honored to have known and worked with him for 14 years. I urge you to take this into account when you pronounce sentence and respectfully ask you to be as lenient as possible.

Best Regards,

*Edward B. Mahony*

Edward B. Mahony